UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

LAREN SALISBURY, et al.,

         Plaintiffs,

    v.

ARTHUR E. HICKMAN, et al.,

         Defendants.

_____/

Case No. 1:12-cv-01098 LJO JLT

ORDER ON THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT

(Docs. 73 & 75)

      Before the Court are the parties' motions for summary judgment.  Having carefully considered the parties' submissions and the record, and for all the reasons set forth below, the Court (1) GRANTS Plaintiff's motion for partial summary judgment and (2) GRANTS IN PART and DENIES IN PART Defendants' motion for summary judgment.

I.      **BACKGROUND**

    A.    **Factual Background**

      This case concerns allegations of sexual harassment and discrimination at Arrowhead Mobile Home Park ("Arrowhead") in Ridgecrest, California.[1]  The parties in this action are (1) Plaintiff Laren

---

[1] When this case was first filed, it also concerned allegations of sexual harassment and discrimination at Whispering Hills Mobile Home Park in Rosamond, California.  (See Doc. 1 ¶¶ 12-16.)   However, those claims have since been settled.  (Doc. 60.)

Salisbury ("Ms. Salisbury"), who has been a resident at Arrowhead since at least 2001; (2) Defendant Umberto Crimi ("Mr. Crimi"), who has been the on-site manager at Arrowhead since March 2012; (3) Defendant Joseph Termini ("Mr. Termini"), who does business as Charter Property Management and is contracted to manage Arrowhead; and (4) Defendants Arthur E. Hickman and Jacqueline Hickman (collectively "the Hickmans"), who own Arrowhead by way of a trust.  The following facts are either undisputed or supported by admissible evidence that is viewed in the light most favorable to the party opposing summary judgment.

### 1.    The First Incident

In the late morning of March 27, 2012, Ms. Salisbury walked her dogs by Mr. Crimi's mobile home en route to her mailbox.  Mr. Crimi and his wife were the new on-site managers at Arrowhead. As Ms. Salisbury passed-by, Mr. Crimi called Ms. Salisbury's name to say hello.  After shaking hands, Mr. Crimi indicated that he would like to talk with Ms. Salisbury, just the two of them.  Ms. Salisbury thought nothing of the request and responded, "Well, you know where I live."  She then proceeded to walk to her mailbox.

An hour later, Mr. Crimi knocked on Ms. Salisbury's door.  Ms. Salisbury invited Mr. Crimi to have a seat in her backyard.  Once in the backyard, Mr. Crimi pulled up a chair close to the back steps. Mr. Crimi then grabbed Ms. Salisbury's hand and told her that he had "urges."  Ms. Salisbury stood up and pulled her hand back.  Mr. Crimi, in turn, stood up and asked Ms. Salisbury if he could hold her in his arms.  Ms. Salisbury pointed to Mr. Crimi's wedding ring and said, "This isn't going to happen." As Ms. Salisbury attempted to back away, Mr. Crimi cornered her against the side of her mobile home and repeatedly said that he had "urges."

The barking of Ms. Salisbury's dog momentarily diverted Mr. Crimi's attention, at which point Ms. Salisbury snuck around Mr. Crimi and went to her front gate so that she would be in public view. Mr. Crimi followed her and repeated that he had "urges."  Mr. Crimi also said, "If you will just let me in the back door."  Ms. Salisbury responded, "No, this is not going to happen" and "You are persistent, but this is not going to happen."

Mr. Crimi eventually left.  Ms. Salisbury went inside her home, locked the doors, and checked the windows.  She then called two friends and told them what had just happened.

### 2.      The Second Incident

Two days later, on March 29, 2012, Ms. Salisbury again walked her dogs to her mailbox.  She believed that Mr. Crimi "got the message" that she was not interested in him because he did not bother her the day before.  As Ms. Salisbury talked to her neighbor by the mailboxes, Mr. Crimi drove up to the mailboxes, looked at them, and then left.

A few hours later, Ms. Salisbury was sitting in the dining room table of her mobile home and was talking to her friend on the phone.  When her dogs began barking loudly, Ms. Salisbury looked up and found Mr. Crimi standing in her kitchen.  She asked what Mr. Crimi wanted.  Mr. Crimi replied, "I came by your house earlier, your truck was in the driveway but I didn't hear your dogs.  So I went to you back door, I turned the knob and it wasn't locked."  Mr. Crimi claimed that he did not actually go in her mobile home.  Ms. Salisbury reiterated, "This not going to happen," and tried to back away from Mr. Crimi.  Mr. Crimi, in turn, kept advancing until Ms. Salisbury was pinned against the kitchen counter.  Mr. Crimi was "right up against" Ms. Salisbury, but he did not touch her.  He said, "If you'll just allow me to hold you in my arms and kiss you."  Mr. Crimi had a trance-like look on his face and kept talking about his "urges."

Mr. Crimi's attention was diverted by the barking of Ms. Salisbury's dog, at which point Ms. Salisbury slipped out the back door.  Instead of leaving altogether, Mr. Crimi went outside and sat in one of Ms. Salisbury's chairs in front of the mobile home.  Hoping that he would leave, Ms. Salisbury sat in another chair and said, "This is not going to happen.  I have to live here.  You have to work here.  It's not going to happen."  Mr. Crimi repeated that he had "urges."  He then asked Ms. Salisbury if she was going to tell his wife.  After Mr. Crimi eventually left, Ms. Salisbury called her friend back, upset and crying.

When Ms. Salisbury went to her bedroom later that day, she noticed that one of her brassieres was not where she had left it.  Instead of lying in a heap on her dresser, it was laid out.  Ms. Salisbury suspected that Mr. Crimi had, in fact, entered her mobile home.

### 3.      Legal Action

On March 31, 2012, Ms. Salisbury went to the police department and filed a complaint against Mr. Crimi.  She also filed a civil harassment petition against him.  On April 4, 2012, the Kern County

Superior Court conducted a hearing on the matter and issued a three-year restraining order against Mr. Crimi.  Despite the restraining order, Ms. Salisbury remains afraid that Mr. Crimi continues to watch her and may harass her.

### B.      Procedural History

Ms. Salisbury initiated this action on July 5, 2012.  She asserts six claims in her complaint: (1) discriminatory housing practices in violation of the federal Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.*; (2) unlawful housing practices in violation of California's Fair Employment and Housing Act ("FEHA"), Cal. Gov. Code §§ 12927, 12955 *et seq.*; (3) discrimination in violation of California's Unruh Civil Rights Act, Cal. Civ. Code §§ 51-52; (4) negligence; (5) breach of the covenant of quiet use and enjoyment; and (6) unlawful entry.  As relief, Ms. Salisbury seeks damages, injunctive relief, and declaratory relief.

On August 5, 2013, the parties filed the pending motions for summary judgment.  Defendants filed their opposition on August 28, 2013, and Ms. Salisbury filed her opposition on August 30, 2013.  The parties filed replies on September 6, 2013.

## II.     LEGAL STANDARD

Summary judgment is appropriate when the pleadings, disclosure materials, discovery, and any affidavits provided establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A material fact is one that may affect the outcome of the case under the applicable law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable trier of fact could return a verdict in favor of the nonmoving party."  Id.

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  The exact nature of this responsibility, however, varies depending on whether the issue on which summary judgment is sought is one in which the movant or the nonmoving party carries the ultimate burden of proof.  See Soremekun v. Thrifty Payless, Inc., 509

F.3d 978, 984 (9th Cir. 2007); Cecala v. Newman, 532 F. Supp. 2d 1118, 1132 (D. Ariz. 2007).  If the movant will have the burden of proof at trial, it must demonstrate, with affirmative evidence, that "no reasonable trier of fact could find other than for the moving party."  Soremekun, 509 F.3d at 984.  In contrast, if the nonmoving party will have the burden of proof at trial, "the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case."  Id. (citing Celotex, 477 U.S. at 323).

If the movant satisfies its initial burden, the nonmoving party must go beyond the allegations in its pleadings to "show a genuine issue of material fact by presenting *affirmative evidence* from which a jury could find in [its] favor."  FTC v. Stefanchik, 559 F.3d 924, 929 (9th Cir. 2009) (emphasis in the original).  "[B]ald assertions or a mere scintilla of evidence" will not suffice in this respect.  Id. at 929.  See also Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.") (citation omitted).  "Where the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (quoting First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

In resolving a summary judgment motion, "the court does not make credibility determinations or weigh conflicting evidence."  Soremekun, 509 F.3d at 984.  That remains the province of the jury or fact finder.  See Anderson, 477 U.S. at 255.  Instead, "[t]he evidence of the [nonmoving party] is to be believed, and all justifiable inferences are to be drawn in [its] favor."  Id.  Inferences, however, are not drawn out of the air; the nonmoving party must produce a factual predicate from which the inference may reasonably be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).

## III.   EVIDENTIARY MATTERS

### A.   Judicial Notice

Ms. Salisbury requests the Court take judicial notice of six facts/documents: (1) the fact that California Code of Civil Procedure section 527.6 authorizes the issuance of temporary and permanent civil harassment restraining orders; (2) the fact that Ms. Salisbury filed a request for such a restraining

order against Mr. Crimi on April 4, 2012; (3) the fact that Mr. Crimi filed a response to the request for a civil harassment restraining order on April 11, 2012; (4) the fact that a hearing was conducted on the issue in the Kern County Superior Court on April 18, 2012; (5) the fact that the Kern County Superior Court issued a three-year restraining order against Mr. Crimi on April 18, 2012; and (6) the state court docket, along with the documents filed in connection with this matter.  (Doc. 74.)

The Court GRANTS Ms. Salisbury's request.  Under Federal Rule of Evidence 201, the court may take judicial notice of "a fact that is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  This includes, as is the case here, state court documents and filings.  See Harris v. County of Orange, 682 F.3d 1126, 1132 (9th Cir. 2012) ("We may take judicial notice of undisputed matters of public record, including documents on file in federal or state courts.") (citations omitted).  Defendants' argument regarding lack of foundation is unavailing.[2]

### B.      Ms. Salisbury's Declaration

Defendants move to strike Ms. Salisbury's declaration because the assertions expressed therein (i.e., the extent of Ms. Salisbury's emotional distress) were not disclosed to Defendants in discovery. (See Docs. 96-6 & 99 ¶¶ 2-4.)  It is not necessary for the Court to rule on this matter at this time.  The Court is able to resolve the pending motions for summary judgment without touching upon the extent of Ms. Salisbury's emotional distress.  Therefore, the Court DENIES Defendants' motion to strike Ms. Salisbury's declaration, without prejudice.

### C.      Missing Deposition Excerpts

Defendants object to several facts because the cited deposition pages were missing.  (Doc. 99 ¶ 5.)  Ms. Salisbury has since corrected that error by filing the relevant deposition testimony.  (See Doc. 106 ¶¶ 2-4.)  Because there is no indication that Defendants were prejudiced by Ms. Salisbury's error, this objection is OVERRULED.

---

[2] In connection with this matter, Defendants also (1) moved to strike the declaration of Julie Tedford on several grounds; and (2) objected to certain transcripts that were taken in the state court restraining order proceeding due to improper authentication.  (See Doc. 91.)  The complained-of deficiencies have since been corrected. (See Docs. 100 & 101.)  Accordingly, Defendants' motion to strike is DENIED and Defendants' objections are OVERRULED.

1    **IV.     DISCUSSION**

2            **A.     Plaintiff's Motion for Partial Summary Judgment**

3            Ms. Salisbury invokes the doctrine of collateral estoppel and argues that Mr. Crimi should be

4    barred from relitigating (1) whether Mr. Crimi engaged in a course of conduct that seriously annoyed,

5    alarmed, or harassed Ms. Salisbury; (2) whether the course of conduct would have caused a reasonable

6    person to suffer substantial emotional distress; and (3) whether Ms. Crimi's conduct did, in fact, cause

7    Ms. Salisbury to suffer substantial emotional distress.  Ms. Salisbury maintains that all of these issues

8    were decided in the affirmative when, after a hearing, the Kern County Superior Court issued a three-

9    year restraining order against Mr. Crimi.

10           The doctrine of collateral estoppel, or issue preclusion, "prevents relitigation of issues actually

11   litigated and necessarily decided, after a full and fair opportunity for litigation, in a prior proceeding."

12   Shaw v. Hahn, 56 F.3d 1128, 1131 (9th Cir. 1995) (citation omitted).  Collateral estoppel "has the dual

13   purpose of protecting litigants from the burden of relitigating an identical issue with the same party or

14   his privy and of promoting judicial economy by preventing needless litigation."  Parklane Hosiery Co.,

15   Inc. v Shore, 439 U.S. 322, 326 (1979).

16           To determine the preclusive effect of a state court judgment in a federal action, a federal court

17   must look to, and apply, the preclusion law of that state, here California.  See McInnes v. California,

18   943 F.2d 1088, 1092-93 (9th Cir. 1991).  In California, an issue decided in a state court judgment may

19   be given preclusive effect if the party asserting collateral estoppel establishes the following threshold

20   requirements: (1) the issue to be precluded from relitigation in the current proceeding is identical to

21   that decided in the former proceeding; (2) the issue was actually litigated in the former proceeding; (3)

22   the issue was necessarily decided in the former proceeding; (4) the decision in the former proceeding

23   is both final and on the merits; and (5) the party against whom issue preclusion is sought is the same

24   as, or in privity with, the party to the former proceeding.  Hernandez v. City of Pomona, 46 Cal. 4th

25   501, 511 (2009); Lucido v. Superior Court, 51 Cal. 3d 335, 341 (1990).[3]

26

27   _____

28   [3] In certain cases, even when the threshold requirements have been met, public policy considerations,
     such as the preservation of the judicial system's integrity and protecting litigants from harassment by
     vexatious litigation, may dictate against preclusion.  See Lucido, 51 Cal. 3d at 342-43.

                                                      7

1    Here, there can be no dispute that the last two requirements – finality and sameness of parties –

2  are met.  The restraining order at issue here was the product of a full hearing on April 4, 2012, wherein

3  Ms. Salisbury and Mr. Crimi were represented by counsel.  Ms. Salisbury largely testified to the same

4  facts as she here in this case, and Mr. Crimi generally denied Ms. Salisbury's allegations, as he does in

5  this case.  The Kern County Superior Court evaluated this testimony, along with the testimony of other

6  witnesses, and concluded that a three-year restraining order should be issued against Mr. Crimi.  That

7  decision has not been appealed and is therefore final.

8    More difficult is determining what issues were actually and necessarily decided by the Kern

9  County Superior Court and how those issues translate to this case.  In granting Ms. Salisbury a three-

10  year restraining order, the Kern County Superior Court made no factual findings other than to note that

11  there was "overwhelming" evidence that Mr. Crimi was present at Ms. Salisbury's home on March 29,

12  2012.  (Doc. 101-1 at 33:13-15.) Therefore, beyond this one factual finding, the only issues that can be

13  said to have been actually and necessarily decided by the Kern County Superior Court are those issues

14  that the court *had* to resolve, statutorily, in order to grant Ms. Salisbury a restraining order pursuant to

15  California Code of Civil Procedure section 527.6.

16    Under section 527.6, a court may grant a petition for a three-year restraining order if it finds by

17  "clear and convincing evidence" that unlawful harassment exists.  Cal. Code Civ. Proc. § 527.6(i); see

18  also Grant v. Clampitt, 56 Cal. App. 4th 586, 591 (Ct. App. 1997).  For the specific purpose of section

19  527.6, harassment is defined as:

20    unlawful violence, a credible threat of violence, or a knowing and willful course of
     conduct directed at a specific person that seriously alarms, annoys, or harasses the
21    person, and that serves no legitimate purpose. The course of conduct must be such as
     would cause a reasonable person to suffer substantial emotional distress, and must
22    actually cause substantial emotional distress to the petitioner.

23  Cal. Code Civ. Proc. § 527.6(b)(3).  It follows, then, from the Kern County Superior Court's decision

24  to grant Ms. Salisbury's petition for a three-year restraining order that the court must have found clear

25  and convincing evidence that (1) Mr. Crimi engaged in a "course of conduct" that seriously annoyed,

26  alarmed or harassed Ms. Salisbury; (2) Mr. Crimi's conduct would have caused a reasonable person to

27  suffer substantial emotional distress; and (3) Mr. Crimi's conduct did, in fact, cause Ms. Salisbury to

28  suffer substantial emotional distress.  See id.

These are the same three issues that Ms. Salisbury seeks preclusion on now.  Accordingly, Ms. Salisbury's motion for partial summary judgment is GRANTED.  Mr. Crimi may not relitigate these specific issues to the extent that they necessarily arise in the context of this case.[4]

**B.    Defendants' Motion for Summary Judgment**

**1.    FHA**

The FHA prohibits discrimination based on sex in the sale or rental of housing.  See 42 U.S.C. § 3604.  Federal courts have recognized that sexual harassment is a form of sex discrimination that is prohibited by, and actionable under, the FHA.  Accord Quigley v. Winter, 598 F.3d 938, 946 (8th Cir. 2010); DiCenso v. Cisneros, 96 F.3d 1004, 1008 (7th Cir. 1996); Honce v. Vigil, 1 F.3d 1085, 1089-90 (10th Cir. 1993); Shellhammer v. Lewallen, 770 F.2d 167 (6th Cir. 1985); Beliveau v. Caras, 873 F. Supp. 1393, 1396-97 (C.D. Cal. 1995).  Specifically, where the sexual harassment creates a "hostile housing environment" or constitutes "quid pro quo sexual harassment," it is actionable under the FHA.  United States v. Hunt, 676 F.3d 649, 654 (8th Cir. 2012) (quoting Quigley, 598 F.3d at 946-47).  See Honce, 1 F.3d at 1089-90.

The issue presented here on summary judgment is whether there is evidence from which a fact finder could reasonably conclude that Mr. Crimi's conduct created *a hostile housing environment*.[5]  As alluded to above, to prevail on a hostile housing environment claim a plaintiff must establish that she was subjected to (1) unwelcomed (2) sexual harassment that was (3) sufficiently severe or pervasive so as to interfere with or deprive the plaintiff of her right to use or enjoy her home.  Quigley, 598 F.3d at 946-47; see Honce, 1 F.3d at 1089-90.  In Defendants' view, the conduct Ms. Salisbury challenges is not severe or pervasive enough to constitute actionable sexual harassment.  Defendants characterize

---

[4] Two things should be noted.  First, issue preclusion has only been asserted against Mr. Crimi and not against any of the other defendants in this action.  Second, this ruling does not entitle Ms. Salisbury to summary judgment on her claims for sexual harassment under the FHA, the FEHA, and/or the Unruh Civil Rights Act.  As will be discussed in the following sections, in order to prevail on her claims for sexual harassment, Ms. Salisbury must prove that she was subjected to unwelcomed sexual harassment that was severe or pervasive.  As Ms. Salisbury herself concedes, this ruling does not establish that the harassment was sexual or that it was severe or pervasive.  (See Doc. 104 at 6.)  At most, it establishes that Mr. Crimi's conduct was unwelcomed.

[5] There was some confusion as to whether this lawsuit also concerned quid pro quo sexual harassment.  However, Ms. Salisbury has since clarified that it does not.  (See Doc. 93 at 11) ("Plaintiff . . . seeks to prove sexual harassment based on a hostile environment.").

9

the complained-of conduct as two brief, isolated incidents that, while perhaps crude and inappropriate, do not arise to the level of a hostile housing environment.

To determine what constitutes severe or pervasive sexual harassment under the FHA, federal courts look to cases interpreting what constitutes severe or pervasive sexual harassment in the context of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq*. See DiCenso, 96 F.3d at 1008; see also Gamble v. City of Escondido, 104 F.3d 300, 304 (9th Cir. 1997) ("Most courts applying the FHA . . . have analogized it to Title VII[.]").  Under Title VII, harassment is sufficiently severe or pervasive to be actionable if it creates a hostile or abusive environment, both objectively and subjectively.  See Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993); EEOC v. Prospect Airport Servs., 621 F.3d 991, 999 (9th Cir. 2010).  This determination requires a court or fact finder to look at and consider "all the circumstances" surrounding the alleged harassment.  Harris, 510 U.S. at 23.  This may include "the frequency of the [harassing] conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the [victim's environment]."  Id.  Although no one factor is dispositive, see id., as a general matter "the more severe harassment, the less need to show a repetitive series of incidents."  Brooks v. City of San Mateo, 229 F.3d 917, 926 (9th Cir. 2000) (citation omitted).

Consistent with this, it is well-established that "isolated and innocuous incidents do not support a finding of sexual harassment."  DiCenso, 96 F.3d at 1008.  For example, in DiCenso a landlord went to the plaintiff's apartment door to collect rent.  Id. at 1006.  While standing at the door, the landlord began to caress the plaintiff's arm and back.  Id.  The landlord also said words to the effect that if the plaintiff could not pay the rent, she could take care of it in other ways.  Id.  The plaintiff responded by slamming the door in the landlord's face.  Id.  The landlord, in turn, called the plaintiff names such as "bitch" and "whore," and then left.  Id.  Under these circumstances, the Seventh Circuit concluded that there was insufficient evidence to support a hostile environment claim.  The Seventh Circuit stressed that the alleged harassing conduct involved only a single incident, and that incident, while unpleasant, was not particularly egregious; it involved no touching of intimate body parts and there was no threat of physical harm.  See id. at 1008-09.

///

1    Similarly, in <u>Honce</u>, the Tenth Circuit held that the plaintiff could not prevail on her claim for

2    sexual harassment.  The circumstances in <u>Honce</u> were as follows:

3        In August 1990, Ms. Honce [the plaintiff] arranged to rent a lot in Mr. Vigil's [the
         defendant's] mobile home park.  Ms. Honce placed a mobile home on the property in
4        mid-September and moved in at the beginning of October.  Mr. Vigil invited Ms.
         Honce to accompany him socially on three occasions in September, prior to her moving
5        in.  He first asked her to attend a religious seminar.  She told him that she would try to
         attend, but did not.  He then offered to take Ms. Honce and her young son to the state
6        fair.  She told him that she would think about it, but did not go.  At their next meeting,
         he asked her to visit some property with him.  She politely declined.  Finally, two days
7        before moving in, Mr. Vigil asked, "When can we go out?"  She responded that she did
         not wish to go out with him at any time.  He told her that he had only wanted to be
8        friends and did not ask her out again.  Both parties testified that Mr. Vigil never used
         profanity or made sexual advances or remarks.

9

10   1 F.3d at 1087.  The Tenth Circuit stressed that the behavior did not include sexual remarks, physical

11   touching, or threats of violence.  <u>Id.</u> at 1090.  The Tenth Circuit concluded that, at most, the defendant

12   asked the plaintiff out to three social occasions, all of which occurred *prior* to the plaintiff occupying

13   the premises, and none of which were sexual in nature.  <u>Id.</u>

14         Defendants argue that the evidence in this case is no more egregious than that in <u>DiCenso</u> and

15   <u>Honce</u>.  To be sure, the complained-of harassment in this case was generally confined to two specific

16   incidents, and like <u>DiCenso</u> and <u>Honce</u>, this case did not involve any violence, overt threat of physical

17   force, or touching of intimate body parts.  Nevertheless, a close look at the circumstances surrounding

18   the two incidents in this case reveals at least two factors that, when viewed in the light most favorable

19   to Ms. Salisbury, distinguishes this case and could well lead a fact finder to conclude that Mr. Crimi's

20   conduct constituted severe sexual harassment.

21         First, although Mr. Crimi's conduct did not involve violence or overt physical force, there was

22   still a degree of physical intimidation and apprehension present.  During both incidents, Ms. Salisbury

23   made it clear to Mr. Crimi that she was not interested, in any way, in his sexual advances and tried to

24   back away from him.  Nevertheless, not only did Mr. Crimi persist with his sexual advances verbally,

25   he also advanced toward Ms. Salisbury physically.  Specifically, during the March 27, 2012 incident,

26   Mr. Crimi cornered Ms. Salisbury against the wall of her mobile home, and during the March 29, 2012

27   incident, Mr. Crimi trapped Ms. Salisbury against her kitchen counter.  Thus, while Mr. Crimi did not

28   overtly threaten Ms. Salisbury with physical force or touch any of Ms. Salisbury's intimate body parts,

his physical conduct was not innocuous.

Second, and perhaps most importantly, the second major incident of harassment on March 29, 2012, took place in Ms. Salisbury's own home. Courts have recognized that harassment in one's own home is particularly egregious and is a factor that must be considered in determining the seriousness of the alleged harassment. See Quigley, 598 F.3d at 947 ("We emphasize that Winter subjected Quigley to these unwanted interactions in her own home, a place where Quigley was entitled to feel safe and secure and not flee, *which makes Winter's conduct even more egregious*.") (emphasis added). As one district court in this circuit noted:

> One commentator has suggested that sexual harassment in the home is in some respects more oppressive: When sexual harassment occurs at work, at that moment or at the end of the work day, the woman may remove herself from the offensive environment. She will choose whether to resign from her position based on economic and personal considerations. In contrast, when the harassment occurs in a woman's home, it is a complete invasion in her life. Ideally, home is the haven from the troubles of the day. When home is not a safe place, a woman may feel distressed and, often, immobile.

Beliveau, 873 F. Supp. at 1397 n.1 (quoting Comment, "Home is No Haven: An Analysis of Sexual Harassment in Housing," 1987 Wis. L. Rev. 1061, 1073 (Dec. 1987)).

The fact that the harassment took place in Ms. Salisbury's home is even more egregious when viewed in light of the fact that Ms. Salisbury lives alone and Mr. Crimi trespassed into her home uninvited and completely unexpectedly. While an intruder would cause someone legitimate concern regardless of his or her gender, a reasonable woman would likely find the combination of circumstances faced by Ms. Salisbury to be especially serious and troubling. See Ellison v. Brady, 924 F.2d 872, 878-79 (9th Cir. 1991) (when assessing the severity of the harassment faced by a female plaintiff, the facts must be viewed from the perspective of a reasonable woman). As the Ninth Circuit acknowledged, women are particularly cognizant of the sad reality that rape and sexual assault pose real, present threats:

> [B]ecause women are disproportionately victims of rape and sexual assault, women have a stronger incentive to be concerned with sexual behavior. Women who are victims of mild forms of sexual harassment may understandably worry whether a harasser's conduct is merely a prelude to violent sexual assault. Men, who are rarely victims of sexual assault, may view sexual conduct in a vacuum without a full appreciation of the social setting or the underlying threat of violence that a woman may perceive.

Id. at 879.

1    Finally, while this fact does not distinguish this case from <u>DiCenso</u> or <u>Honce</u>, it is nonetheless

2    worth noting that Mr. Crimi is not any ordinary resident at Arrowhead; he is the community's on-site

3    manager.  Generally speaking, sexual harassment by someone in a position of authority is more likely

4    to be emotionally and psychologically threatening.  See <u>Craig v. M&O Agencies, Inc.</u>, 496 F.3d 1047,

5    1056 (9th Cir. 2007) (recognizing in the context of a hostile work environment that sexual harassment

6    by one's boss is more coercive than sexual harassment by a co-worker).  That proposition applies with

7    equal force here.  Presumably, as the on-site manager, Mr. Crimi is first in-line to respond to any issue

8    that might interfere with Ms. Salisbury's use and enjoyment of her residence, such as a rent dispute or

9    a request for repairs.  Mr. Crimi's ability to influence Ms. Salisbury's well-being thus adds yet another

10   degree of severity to Mr. Crimi's conduct.  This reality exists even if Mr. Crimi did not engage in any

11   quid pro quo sexual harassment.

12   In sum, when viewed in its entirety, there is sufficient evidence in the record for a fact finder to

13   conclude that Mr. Crimi's harassing conduct was sufficiently severe or pervasive as to create a hostile

14   housing environment in violation of the FHA.[6]  Accordingly, Defendants are not entitled to summary

15   judgment on this claim.

16   **2.      FEHA, Uhruh Civil Rights Act, and Negligence**

17   Defendants move for summary judgment on Ms. Salisbury's claims under the FEHA, under

18   California Civil Code section 51.9,[7] and for negligence by largely repeating the arguments they make

19   with respect to Ms. Salisbury's FHA claim: the challenged conduct is not severe or pervasive enough

20   to be actionable.  The elements and analysis for sexual harassment claims under the FEHA and section

21

22   [6] Parenthetically, the Court notes that the conduct in this case appears to be at least as egregious as the
     conduct found to be sufficiently severe or pervasive by the Ninth Circuit in <u>Ellison</u>, wherein the Ninth
23   Circuit reversed summary judgment on the plaintiff's hostile working environment claim where the
     harasser "pestered" the plaintiff, asked the plaintiff out on a few occasions, and wrote the plaintiff two
24   disturbing letters.

25   [7] As Defendants correctly point out, while Ms. Salisbury has labeled one of her claims as arising under
     the Unruh Civil Rights Act, it is actually a claim under California Civil Code section 51.9.  The Unruh
26   Civil Rights Act refers to California Civil Code section 51 *only*.  See <u>Hughes v. Pair</u>, 46 Cal. 4th 1035,
     1044 n.1 (2009).  That section makes it unlawful to discriminate against a person in providing business
27   services and accommodations.  See Cal. Civ. Code § 51(b).  Here, Ms. Salisbury makes no attempt to
     argue that she asserts such a claim, or asserts any other claim other than one under section 51.9.  (See
28   Doc. 93 at 18-19.)  The Court will therefore construe this claim accordingly.

51.9 mirror the elements and analysis under the FHA and under Title VII.  See Hughes v. Pair, 46 Cal. 4th 1035, 1048-49 (2009) (analyzing section 51.9); Brown v. Smith, 55 Cal. App. 4th 767, 780-84 (Ct. App. 1997) (analyzing the FEHA).  Accordingly, for the same reasons set forth in connection with Ms. Salisbury's FHA claims, Defendants are not entitled to summary judgment on Ms. Salisbury's FEHA or section 51.9 claims.

As for Ms. Salisbury's negligence claims, it is conceivable that a landlord may breach his duty of care to his tenants by failing to take reasonable steps to protect his tenants from severe or pervasive sexual harassment.  See generally Cal. Civ. Code § 1714(a); Portillo v. Aiassa, 27 Cal. App. 4th 1128, 1133-34 (Ct. App. 1994) (landlords have a duty to ensure the security of their tenants).  Defendants do not try to argue otherwise or address this matter in any meaningful way.  Accordingly, Defendants are not entitled to summary judgment on Ms. Salisbury's negligence claims.

### 3.      Breach of the Covenant of Quiet Use and Enjoyment

Defendants contend that they are entitled to summary judgment on Ms. Salisbury's claim for breach of the covenant of quiet use and enjoyment because Ms. Salisbury still resides at Arrowhead. Defendants insist that where a tenant has not vacated the premises, there can be no claim for breach of the covenant of quiet use and enjoyment.

There is some authority supporting Defendants' position.  See Petroleum Collections Inc. v. Swords, 48 Cal. App. 3d 841, 847 (Ct. App. 1975) ("[T]he covenant of quiet enjoyment is not broken until there has been an actual or constructive eviction."); Clark v. Spiegel, 22 Cal. App. 3d 74, 80 (Ct. App. 1971) ("There can be no eviction, actual or constructive, if the lessee continues in the possession of the premises.").  However, more recent California cases have criticized this position and have held that a tenant need not vacate the premises before suing for breach of the covenant of quiet enjoyment. The leading case for this position is Guntert v. City of Stockton, 55 Cal. App. 3d 131 (Ct. App. 1976). In Guntert, the court concluded that instead of vacating the premises, a tenant may respond to a breach of the covenant of quiet enjoyment by standing on the lease, remaining in possession of the property, and suing for contract damages:

> A number of decisions describe a rule declaring that a nonphysical interference with the tenant's enjoyment constitutes a constructive eviction; that the tenant may not recover for the eviction unless he first vacates the premises.  Another version of the rule is that

14

the covenant of quiet enjoyment is not breached until there has  been an actual or constructive eviction.

Stated in these flat terms, the rule would preclude a tenant from seeking damages for a breach of quiet enjoyment not amounting to an eviction.  Stated in these terms, the rule is incomplete, for it fails to recognize the tenant's choice of remedies for breach of the lease, namely, his option to stand upon the lease and sue for damages.  Decisions in other states draw a distinction -- the rule demanding surrender of the premises preceding a suit for impairment of quiet enjoyment is inoperative where the tenant elects to stand upon the lease and claim damages.

Id. at 140 (internal citations omitted).  Guntert has recently been followed by several California courts of appeal.  See Ginsberg v. Gamson, 205 Cal. App. 4th 873, 897 (Ct. App. 2012) ("Thus, breach of the implied covenant of quiet enjoyment can be understood as a title encompassing claims for wrongful eviction, and also claims in which the tenant's use of the premises is disturbed, but the tenant remains in possession."); Andrews v. Mobile Aire Estates, 125 Cal. App. 4th 578, 590 (Ct. App. 2005) (as an alternative to surrendering the premises upon a breach of the implied covenant of quiet enjoyment, "a tenant may elect to stand upon the lease, remain in possession and sue for breach of contract damages as well as for injunctive relief.") (citations and internal quotation marks omitted).

Following Guntert here, the fact that Ms. Salisbury has not vacated her home at Arrowhead is not necessarily fatal to her claim for breach of the covenant of quiet use and enjoyment.  Accordingly, Defendants are not entitled to summary judgment on this claim.

### 4.    Unlawful Entry

Defendants note that Ms. Salisbury cites two statutes in connection with her claim for unlawful entry: California Civil Code section 1940.2 and California Civil Code section 1954.  Defendants argue that Ms. Salisbury lacks evidence to support a claim under either statute.

### a.    Section 1940.2

Section 1940.2(a) makes it unlawful for a landlord to engage in certain conduct, such as theft, extortion, or the use of force, "for the purpose of influencing a tenant to vacate a dwelling."  Cal. Civ. Code § 1940.2(a).  Here, there is no evidence demonstrating that Mr. Crimi engaged in conduct for the purpose of influencing Ms. Salisbury to vacate her home at Arrowhead.  Nor does Ms. Salisbury even attempt to argue that such was the case.  (See Doc. 93 at 21-22.)  Defendants, therefore, are entitled to summary judgment on Ms. Salisbury's unlawful entry claim to the extent that the claim is predicated

on a violation of California Civil Code section 1940.2.

### b.    Section 1954

Section 1954 limits the circumstances under which a landlord may enter a dwelling unit.  One of the few circumstances listed in the section is "in case of emergency."  Cal. Civ. Code § 1954(a)(1). Defendants attempt to seize upon this exception by arguing that an emergency prompted Mr. Crimi to enter Ms. Salisbury's home uninvited on March 29, 2012.  Specifically, Defendants maintain that Mr. Crimi entered Ms. Salisbury's mobile home only after he had dropped by earlier in the day and noticed some "unusual" circumstances, namely: (1) Ms. Salisbury and her dogs were gone; (2) Ms. Salisbury's truck was still in the driveway; and (3) the backdoor was unlocked.  (Doc. 73 at 12.)

Defendants' construction of the evidence is unconvincing.  Putting aside that there was, in fact, no emergency, a fact finder could conclude that it was not reasonable for Mr. Crimi to *believe* that an emergency existed.  The "unusual" circumstances that Mr. Crimi allegedly observed suggest that Ms. Salisbury was out walking her dogs, not that some sort of emergency was afoot.  And even if there could be any doubt, there was nothing a simple knock could not resolve.  Defendants are not entitled to summary judgment on Ms. Salisbury's unlawful entry claim to the extent that the claim is predicated on a violation of California Civil Code section 1954.

## V.    CONCLUSION AND ORDER

In accordance with the above, the Court:

1.    GRANTS Plaintiff's motion for partial summary judgment; and

2.    GRANTS IN PART and DENIES IN PART Defendants' motion for summary judgment as follows:

  a.    Defendants are GRANTED summary judgment with respect to Ms. Salisbury's claim under the Unruh Civil Rights Act to the extent that the claim is predicated on a violation of any statute other than California Civil Code section 51.9;

  b.    Defendants are GRANTED summary judgment with respect to Ms. Salisbury's claim for unlawful entry to the extent that the claim is predicated on a violation of California Civil Code section 1940.2; and

16

1      c.      Defendants are DENIED summary judgment in all other respects.[8]

2

3

4

5   IT IS SO ORDERED.

6      Dated:   __September 24, 2013__          ____/s/ Lawrence J. O'Neill____
7                                                     UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   [8] The Court notes that Ms. Salisbury's pleadings are not completely clear with respect to which claims apply to which defendants and on what basis.  For example, Ms. Salisbury's negligence claims do not
26   specify whether Mr. Termini and the Hickmans are sued in their personal capacities, and if so, which facts form the basis of that liability.  The Court expects Ms. Salisbury to make this clear in any pretrial
27   statement the parties submit, should this case reach that stage.  **In the meantime, if at any point the parties believe that a settlement conference would be fruitful, they should not hesitate to contact**
28   **the chambers of the Magistrate Judge assigned to this case.**

17